Please be seated. Good morning. We want to welcome all counsel who are here to argue cases with before us this morning in Hawaii. Wayne, we got a little bit of a feedback. Maybe Kwame can help us with that. Okay. We have one matter that was submitted on the briefs and we'll proceed to the argument calendar. The first case is Case 23-4314, Owl Link Technologies v. Cypress Technology. Mr. Shammagam. Thank you, Judge Brass. Kenneth Shammagam of Paul Weiss for Appellant Cypress Technologies, and with the Court's leave, I'd like to reserve three minutes for a rebuttal. May it please the Court, this case presents a question of contract interpretation on which the District Court reached an untenable result. The contract between the parties here, known as the EBMA, expressly provided that it terminated upon the termination of the ODM contract, which it defined as a contemporaneous terms and conditions agreement between Cypress and Crestron. Once the terms and conditions agreement terminated, the EBMA terminated as well. At most, therefore, Cypress could be liable for two years' worth of damages as a result of its premature negotiation. Give us a second to address that. Okay. Yes. The jury in this case awarded and the District Court upheld damages over not a two-year period, but instead a seven-year period. Can I ask, was it a termination when it was only when the contractual arrangement ceased for basically one minute? Yes. Judge Brass, the duration of the termination, in our view, is of no moment, and that's because of the operation of the clear terms of the EBMA itself. The EBMA indicated in Section 7.1 that the agreement will continue until the earlier of two things. Here, the relevant thing, the termination of the ODM contract. There was no condition on that. Was there a requirement to give notice of the termination to Owl Link, or do you contend that wasn't a requirement either? No requirement of notice to Owl Link. The ODM contract itself, by its terms, permitted Crestron to terminate. It required Crestron to provide notice to Cypress. There was also a waiting period, which Cypress waived. Again, if Owl Link had wanted to condition termination on something more than the termination of the ODM contract, it, as a sophisticated party, could have negotiated for that. Indeed, the testimony of Owl Link's president, Mr. Paul Zhang, was precisely to that effect. At pages 691 to 692 of the record, I guess this didn't get to the jury, they didn't decide this, but is there not a good faith argument on the notice? There was a claim of a breach of the implied duty of good faith, and the jury, as you indicate, Judge Brass, did not reach that issue. That claim was not resolved by virtue of the resolution of the primary claim on the breach of contract. Again, I think the disagreement between the parties here really boils down, at its core, to the operation of Section 7.1. Our submission to the court is that these provisions work together in a very logical way. Essentially, the way that this works is that you do have some protection for Owl Link in the form of Section 2.4. That is the provision that prohibits Cypress and Crestron from communicating, and that extends for two years after termination. So really, what was going on here at trial was that there were really two separate theories of breach. They were not disaggregated in the verdict. The first and more expansive theory was this theory that there was no termination, and therefore that the contractual obligation continued for some unspecified period of time. If we are correct about the construction of the contract, that theory goes away, and then you're left with the narrower theory, which is that prior to termination, there was a breach of this no communication provision in 2.4. As I indicated at the outset, that's what provided protection to Owl Link. Owl Link could potentially get... The argument seems to be made on the other side that when it references the contract, it's referencing sort of future agreements and not just the accident agreement, the accident 2014 T&Cs. So how do you address that? That is the alternative argument. So just to be clear, as the case now stands before the court, of the three theories that were advanced below, Owl Link has now effectively abandoned the theory about incorporation. So they're really making two arguments. The first, that there was no valid termination, which we've been discussing. The second, this argument that the term ODM contract refers to any terms and conditions agreement between Cyprus and Crestron. Now, I'll say that that was Owl Link's primary theory below. Owl Link, I think, is now deemphasizing that theory, and for good reason. I think when you look at the language of the EPMA, it defines ODM contract with a specific and detailed name. It repeatedly refers to the agreement between Cyprus and Crestron, not any agreement. And it contemplated that a true copy of the ODM contract would be attached. What is the distinction between the 2020 T&Cs, which you claim are not part of the ODM contract, and the amendments to the 2014 T&Cs, which everyone seems to treat as part of the ODM contract? Sure. So, Judge Bress, I would start from the point of agreement. I think that there is agreement between the parties now, that notwithstanding the fact that the original 2014 agreement was not attached, that that constituted a qualifying ODM contract. Our view is that nothing in the EPMA precludes the parties from amending the contract, and as Owl Link points out, there were somewhere in the neighborhood of 12 amendments during the life of that contract, none of which is material here. But I think that the fact remains that there is a difference, Judge Bress, between an amendment on the one hand and termination on the other. And there is no doubt that there was termination, that there was a new agreement that came into effect. Some of the terms of that new agreement were different from the terms of the 2014 agreement. And so I think that that is, by any understanding, a different agreement, which is why Owl Link has to make the argument, I think, that this provision refers to any agreement between the parties. Counsel, I apologize. Go ahead, Judge. So I had a question for you. I wanted to go back to the issue related to 2.4 and Section 2.4, which precluded Cypress from having communications directly with Creston. How does that square with the one-minute termination not being a termination? So I think that the way that all of this should operate is that the right to terminate is absolute in the sense that under Section 7.1, there's no condition that the parties have to have complied with the requirements of Section 2.4. I think what Section 2.4 does, Judge D'Alba, is essentially to create an efficient breach provision, which allows the parties the opportunity to get out from the contract, but to potentially be liable for two years of damages. And we did have defenses to that aspect of the claim, but I think that the critical point is that if you agree with us that there was a termination here, then I think that the case really almost has to go back, because you had a verdict in this case that didn't disaggregate those two theories of breach from each other. Your breach provision, is that a liquidated damages provision? So I think that the way that this would operate, it's not quite like a liquidated damages provision. I think by virtue of the operation of 7.5, the theory of damages, on which the damages experts largely agreed, is that you would operate in a but-for world, where you would essentially say, because there was a breach of 2.4, and because that obligation continued for two years, you would calculate the relevant commissions for that period. And there was a meaningful difference between the experts on what that amount should be. I think our experts said no more than $4 million. Their experts said $10 million. That's obviously a lot less than what was awarded here. But I want to come back to one sort of broader point that touches on both Section 2.4, I think, and Section 7.1, and the interplay between these provisions. I think the problem with Alling's interpretation here is that the EBMA would seemingly remain in effect indefinitely. As we point out in our reply brief, it's not entirely clear how the parties could ever get out from the obligations of the EBMA. They're saying you should just wait two years. Well, I think that under their interpretation, but this is a question for my friend Ms. Sherry, I think their view is that if the parties silently terminated the agreement, and then proceeded for two years without having any communications, then perhaps there would not be a breach. But what happens if the parties communicate during those two years? Does that render the termination invalid under their interpretation? I frankly think it's a little bit unclear. What is the relevance of your clients not telling Alling about the termination? Because that seems to be part of their beef here, is that they were cut out of this agreement and they found out about it later, accidentally, and the situation could have persisted seemingly for years without them learning about that. What does that do to the legal theories or to the damages? Well, I think Alling's president himself testified that the EBMA did not require prior notice of the termination of the ODM contract. That's a testimony I adverted to at pages 691 to 692 of the record excerpts. So I don't think that the failure to provide notice has any significance, but it may very well be that by virtue of the fact that there were these communications, that Cyprus would nevertheless be on the hook for these two years of damages, Judge Brass. So I don't think this is a situation in which Alling would be left without any remedy at all. But remember that what Alling got here was by virtue of their expert's testimony. The expert testified that he thought that this agreement would remain in effect for its commercial life of up to seven years. The jury awarded somewhat less than that. That is the theory that in our view cannot proceed under a construction, a proper construction of the contract. What is the relevance at this point of the 2014 TNCs not being attached to the EBMA? I think it has no significance, and as the court will be aware, our fallback argument here concerns the jury instruction. What was the significance of this issue in the district court, in the trial, and how did it come to seemingly be not significant now in your view? So we argued in the course of the summary judgment briefing that this issue of incorporation should not go to the jury, that as a matter of law, it was not a valid consideration. The district court disagreed with us. And then we proceeded to— What issue shouldn't go to the jury? Whether it's the fact that it wasn't attached to the— Correct. And more broadly, that the validity of the incorporation was not sort of a relevant factor, which is to say that whether or not the 2014 agreement was properly incorporated by reference into the EBMA. Now we have our fallback argument concerning the instruction here, and I do think with sought to sow a great deal of confusion on this issue before the jury by suggesting that by virtue of the fact that the 2014 terms and conditions not just were not attached but were not final as of the time of the EBMA and were not signed as of the time of the EBMA, that that somehow supported their position and not ours. Did your clients ask for a different instruction? We did. If you take a look at page 234 of the record excerpts, we asked for an instruction that omitted the language concerning whether or not those terms, quote, existed at the time of incorporation. And Al Link's counsel— You seem to also be saying there was some additional language from our Pablon case that you would have wanted in the instruction. Did your clients ask for that additional language below? No, but I think that the language that we proposed achieved the same result, Judge Brass, which was to take off the table any suggestion that by virtue of the fact that the ODM contract had not been signed as of the time of incorporation, that the incorporation was somehow invalid. Now, again, our broader legal argument here is that incorporation doesn't matter. We are resting on the language of Section 7.1, which turns on the termination of the has taken place. And so I do think that this argument was a red herring, but it was an argument that Al Link pressed throughout the trial and that now Al Link, I think, has clearly in its appellate brief abandoned. Does the court have any— I do have questions, actually. I want to know why it is that Cypress believes it's entitled to an entire new trial and not just a trial on damages. So certainly at a minimum, if the court agrees with us, the jury did not resolve what the appropriate measure of damages would be on the more modest theory of breach. Our argument, though, Judge D'Alba, is that if the court does agree that there was error here, that we should get a broader new trial because it is unclear how the jury would have resolved the question of liability if the only theory of breach in front of it was this theory of a breach of Section 2.4. Our primary defense on that claim was that it was Crestron and not Cypress that was the instigator here, and therefore under California law, this was not a situation in which Cypress was the substantial factor in causing harm, which is necessary in order to have liability. And precisely because these two theories of breach were not disaggregated, we don't know what the jury would have thought about that. And so we think that it would be appropriate for the court to allow a new trial on that issue, and then if the jury decides to award damages, it can resolve this disagreement between the parties. Was Crestron a party to the agreement? So Crestron was a party to the ODM contract, obviously. It was not a party to the EBMA. And I would note, in case this is something that you're wondering, that the ODM contract had a specific provision indicating that there were no third-party beneficiaries of that  Okay, so Section 2.4 didn't bind Crestron? So that is correct. It is only an obligation that Cypress had, but if you take a look at the instructions in this case, and in particular I would point you to page 53 of the record excerpts, there was an instruction given that indicated that one of the elements here was that Cypress's breach was a substantial factor in causing Al-Nik's harm, and again, we presented evidence it was disputed between the parties that, again, Crestron was the party that triggered these negotiations, and that was the party seeking to have a new ODM contract between Cypress and Crestron. If there is a new trial, as you suggest, on a broader basis, the Covenant of Good Faith and Fair Dealing would also have to be part of that trial, correct? I think potentially, yes, that that is right, because the jury obviously did not resolve that issue. And this was a relatively brief trial, it was six days, so I don't think that this would impose a great deal. You say potentially, but is there any circumstances in which it wouldn't be? I, standing here, I can't think of one, because that would be a claim that presumably Al-Nik would want to press on remand, and again, it was not resolved by the jury. Okay, we've kept you on the run, so we'll put three minutes on the clock for rebuttal, and we'll hear from your opposing counsel. Ms. Sherry, good morning. Good morning, Your Honors. May it please the Court, Melissa Arbasheri here on behalf of Cypress Technology. Let me just start with the incorporation by reference issue, because I wanted to set the record straight. We did not press that during the trial at all. You could look at the entire trial transcript, and in fact, at page 1064 of the excerpts of record, our counsel said to the Court, I'm not really sure why we're talking about incorporation by reference anymore. It's not how the evidence came in. Same statement at about 1089 to 1090 of the excerpts of record. They proposed a jury instruction on incorporation by reference. It's the one they pointed to. In fact, the instruction given mirrored their instruction with the exception of the one part in subpart three that we're talking about, and their JMAL, renewed JMAL, focused on incorporation by reference. If you look at the jury instructions as a whole, there were six jury instructions on contract interpretation, starting with number 31. This is the excerpts of records 55 to 60. What the jury had in front of it was just California law on contract interpretation, disputed words, looking at the contract as a whole, looking at the conduct of the parties. This was not our issue at trial by any means. In fact, if you look at our opposition to the JMAL, what we said were there are two evidentiary bases to uphold the jury's verdict on validity of termination. One was this ODM contract issue, and the other one was whether or not this is really a termination. Let me get to those two key points. First, on the ODM contract, we are not running away from that at all. Their argument is very formalistic. They say, look at it. It's capital letters. It has the definite article. It says Exhibit A. The problem is their argument falls apart on this formalistic interpretation, because if you look at the words in 7.1, it is referring in capital letters to a contract that has a different name. It says standard not modified. Exhibit A was never attached. What does that mean? It opens the door to look and see what the parties intended. They said the parties Crestron and Cypress will enter into an ODM contract. Why? For this purpose. This is the whereas clause in the beginning of the EBMA, page 1211. For this purpose. What purpose? The purpose is for Cypress to design, manufacture, and sell to Crestron certain HDMI products. It didn't just incorporate the 2014 terms and conditions, as acknowledged by my friend on the other side. It incorporated every single one of the 12 amendments over the course of six years. Whatever it means, why would it mean something that was entered into after a termination? Well, this gets to the 60-second issue. I guess it gets to two things. One is, what does ODM contract mean? In our position throughout, and I think this is well supported by the EBMA, is that it is any terms and conditions that governs the relationship between the parties when it comes to these HDMI products. The 2020 terms and conditions, same parties, same exact title. If you look at 1219 and 1250 next to each other, they're both called the modified terms and conditions. Same products, very same purpose. I guess the question I would have is, would we draw a different significance from the 2020 T&Cs when they followed a formal event in the contract, which was a termination? I don't think at all, because termination, of course, means an end. It means an end to something. Nothing ended. In fact, intentionally, nothing ended, because Crestron said, we will only do this if there are no gaps. This was uninterrupted, continued from one minute, literally, to the next. The same relationship, the same products, the same parties. I think maybe it goes in part to what termination means. My friend on the other side will say, well, it says termination, so that means anything that happens. The 60-second pause counts. Termination means an end to something. Nothing ended. There are a number of cases cited throughout the briefs that show that you can't just look at termination in the abstract, in a contractual circumstance. You have to look at the contract as a whole. How long did it have to be terminated for? Here it was terminated for a minute. What if it was a month? It needs to be, our view, it needs to be a clean break. I know my friend on the other side said it's unclear what our position is on this. It has to be a clean break. The parties have to be walking away from each other, walking away from engaging in this contractual relationship. The longer the period of time is, and if there's not evidence that they said, wink, wink, we're going to get back together in a week and keep this going, then it starts to look like a clean break. Then you're talking about 7.5. I just want to spend a minute on 7.5 as well. You're on your question, is it a liquidated damages provision? That is how they are treating it. They talked about efficient breach. That's not how it reads. 7.5, if you look at it, it's a basic survival provision. It's not just about 2.4. It covers section one, section four, section five, section six, section seven, and section eight. Basically, most of the provisions in the contract are included in this survival provision. It says they survived for two years after termination. Again, this is any termination. It's not just 7.1. It's termination for convenience under 7.3. It's termination for cause under 7.2. There is a ton of work for the survival provision to do that have nothing to do with 2.4, have nothing to do with these facts. As far as 2.4 goes, what does it do? It doesn't say we're going to cut damages off at two years. That would look very different if that's what they had written into the agreement. Instead, and Mr. Zhang testified at trial to this, what it says is if their relationship breaks down, Krestron gets upset with Cypress, doesn't want to deal with them anymore, and they do have this clean break, it gives Outlink two years to get them to start talking to each other again, to get them to work together again, to fix the relationship, to possibly re-engage. If they decide, as they did, that your client is not necessary in this relationship, what were they supposed to do to accomplish that? They were supposed to come talk to us, not do this whole behind-the-back thing. Is that a contractual obligation, or is that a good-faith argument? They are bound by this contract. They didn't write a contractual out for themselves. They didn't write in, we can terminate at will. We did. They didn't. They didn't write in, you know what, let's just do this for five years. We'll revisit in five years, see how the relationship's going. They didn't do that. They didn't do that for a reason, and it's because of the nature of this kind of contract. There are tons of upfront costs that my client put in here. Effort to get them together, to have this relationship work, and they were. My client was a middleman. What happens in those circumstances? You worry. You worry the two sides, after a number of years, all of the hard work are going to say, you know what, we don't need you anymore, we're going to save money and do it ourselves. My client was worried about that, and that wasn't some secret. He told them. He said, I need 2.4 in the agreement when Cypress tried to take it out, said I need it in there because I'm worried you're going to try to cut me out. What did they say? They said, Paul, don't worry about that. We're not going to do that to you. That's at 479 of the excerpts of record. Their position would seem to be, your client is protected, but up to two years worth of the value. Yeah, and I think that just goes back to reading 7.5 to be something that it's not. The concern about cutting him out, you know, two years doesn't remotely make up for the damage that was caused by the six year relationship. The idea of damages in general, right, is you get whatever you're entitled to, but for the breach. They never would have been able to enter into even this fake termination, but for the breach of 2.4. It took six months of clandestine conversations and negotiations to even enter into that piece of paper, and Crestron was clear as day, we are not going to do that. If there's a single gap in our relationship, we need the products, we need everything to keep moving as it is. And so the 2.4 breach is what allowed them to even sign that piece of paper, and nothing in the contract suggests that the parties agreed on day one, you know what, I don't want you to talk to each other, but if you do it, no big deal, just pay us for two years and we'll go our separate ways. They didn't negotiate for that. It's not what the contract says, and you know, yes. If they did decide that we don't want Owl Link in the middle of this, were they supposed to cease their interactions for two years and then pick that up, or was there a price to pay to do that? Right, they had two options. I mean, the obvious one is when you have a contract you're no longer happy with and you don't have a way out because you haven't negotiated one, is you go talk to them and say we're unhappy, can we either A, renegotiate, or B, let me buy you out of the contract. I mean, it would be like, you know, my daughter saying, I know you said I couldn't do something, but I really, really wanted to do it and I knew if I just asked you, you would say no. I mean, that is the essence of their argument. They didn't come talk to us. My client said, come talk to us. It's business. We can renegotiate. They didn't provide any protections in the contract for themselves to get out when they wanted to get out, and now they're trying to read 7.1 to be way more than it was intended to be. The point of 7.1, I mean, it's an entitled term. It says this is when the contract begins, this is when the contract ends, and when it's talking about termination of the ODM contract, the idea is when you two are no longer working together for this purpose, then the EBMA is over because it really serves no purpose at all at that point, and that did not happen. The opposite happened. We're talking about a 60-second dead of night pause in the relationship. Again, same title, same parties, same purpose, same products that we had spent years developing, and the jury, importantly, we haven't talked about the jury. The jury heard all of this evidence under California contract law. All of that is important, and the only question is whether or not the language is reasonably susceptible to the reading we're giving it, and it's more than that. Again, termination is not a defined term. ODM contract is, but it's not the one that they say it is. Nothing was attached. This essentially, at the end, it's a 13th Amendment. That's all it was. It's a 13th Amendment. They called it something else because they wanted to fit within the language of 7.1, but it's nothing more than the 13th Amendment. The other side says, if this is right, there's this indefiniteness problem in terms of when does the contract actually end, and how would they go about undoing it. Do you think that's an issue? They haven't identified why that's a legal problem. They had an argument below about restraint of trade and the like, but the court dismissed it and they don't re-raise that on appeal, and they didn't have any evidence on that point. I don't think it's surprising, again, that it's an indefinite agreement. They could have, of course, tried to say, you know what, this is a great idea, but at some point, we might not need you anymore, so why don't we do it for five years and revisit? They could have, again, tried to negotiate for something where I'm not sure my client would have agreed or certainly wouldn't have agreed on these terms because of all the upfront costs and efforts going into it. It's really no answer for them to say, we really wanted to get out, we didn't have any way out, so we decided to do this kind of dead of night, quote unquote, termination that didn't end anything at all. But, I mean, the EBMA doesn't say, doesn't provide any other conditions on termination, it just says you can terminate. Even though it was only a minute, why isn't it a formal act of termination that would trigger the provision? Because it needs to be an end to the contractual relationship between the two, and it's not that, and also because termination has to have some real meaning, and so if I can give the court an example, so let's say there's an employment contract, and an employee's benefits vest after a year, and they vest so long as you haven't been terminated within a year. If the employer fired and terminated, quote unquote, the employee on day 364 at 1159 p.m. And one minute later, rehired that employee, I don't think any court would read that to say, oh, well, that's a termination, I guess your benefits don't vest. It has meaning, and really, when we're talking about California contract law, the crux of all of this is what did the parties intend? And so for all of the formalistic arguments, taking a step back, what did the parties intend rather in 2014 when they entered into this arrangement? When they talked about termination of the ODM contract, something they hadn't even entered into and finalized yet, what were they saying? When you guys stop working together under a contract, when you stop selling these HDMI products that we're going to help you develop, at that point, there's no point in having an EBMA anymore. It serves no purpose. I guess one point on the new trial, I hope the court doesn't get there, but if the court is starting to think about a new trial, the idea that they should be able to take back their conceded breach really makes no sense at all. This isn't just liability that the jury found. This was a conceded breach in the opening statement. In the closing statement before the court, they said, well, yeah, there's a technical breach, and the court said there's nothing technical about it. So the 2.4 breach is clear as day, and there's no reason they should go back to be able to relitigate that. The good faith and fair dealing, absolutely, that would be on the table, but I think that just goes to underscore why they shouldn't go back in the first place. The jury heard all of this evidence. The jury considered all the evidence, had the instructions. Is the lack of notice to your client and the not telling your client about the alleged termination, is that a good faith and fair dealing argument, or is that something else? No, I think it is a good faith and fair dealing argument. I also think maybe it goes to the point I was making earlier, which is they wouldn't have been able to carry off this, what they're calling a termination, without having engaged in these six months of behind the scenes dealing with Crestron, because had this been above board, had they come to our client, had we been aware of it, it is very unclear and perhaps not particularly likely that they would have successfully done the 60 second lapse in the dead of night. I think it's relevant to tell the story and to explain why the two are intertwined, but I guess that gets me to one other point. My friend is wrong when he says that valid termination is part of any breach claim. It was not part of any breach claim at all. The breach claim that the jury found was based on 2.4. Valid termination came in only as their argument to mitigate damages. Our experts said seven years, we think the agreement would have stayed intact for seven years. They came back and said, no, no, no, see, there was a termination, so we think they'd only get two years of damages. That's at page 1060 of the excerpts of record and 1061, where they argued this is a way to cut off damages. It was never about breach. If they want to continue their relationship, but they want you out of it, and they don't necessarily want to negotiate with your client further and just want to be done, is your position then that they would need to cease working together for two years before they start working together again? Yes. Where do you get that from the contract? Because the contract says that you can't have direct conversations. That's 2.4. It doesn't provide them termination for convenience, termination of right. It's not a basis for cause, because they don't want to do it anymore. They have no termination right that they negotiated for. All that's left is the two-year survival period. If they really did terminate, if they said, we want out, we are terminating, we're getting out of the ODM contract entirely, and there's a clean break for two years, and two years later they get back together, then I guess we're just out of luck. The reality is that was never going to happen, because Crestron needed these products. These are not off-the-shelf products that they had spent years developing. A two-year clean break was not in the cards for any of the parties, which is why the answer was if they wanted, we don't need you anymore, thanks for all of your help, we'd like to go our separate ways and make more money, their option was to come talk to us and try to renegotiate. That's what happens when years later you look at a contract and wish you had negotiated for different rights. I know we're taking you over your time, but can you address this jury instruction? Yes. So, the jury instruction, two points on that. One is how the objections developed and what the objections actually were. The objections at trial, again, they proposed that instruction minus the few words we're talking about today, and their arguments essentially came down to that tells the jury that this needed to be signed and finalized, but it doesn't say that, right? It says must exist, it comes directly out of this court's Pablon decision, it says nothing about signing. And in fact, an earlier version did talk about signing and the court said, no, no, no, that's not the law, I'm not going to give that instruction. And so, I think at the best, what their argument is one about formulation, and maybe the jury might have incorrectly thought that signing was required, but it doesn't say that, and if we're just talking about formulation, it's an abuse of discretion standard, and the Gracie v. Gracie case that's cited in their opening brief and reply deals with the use of trademarks and says, okay, maybe you could read it either way, but if we're just saying you could read it either way, that's not enough to reverse. I think the language is exactly right. The idea is when you're talking about incorporation by reference, the parties need to know about what you're incorporating or it needs to be easily available, and so, in a sense, it does have to exist. And maybe this is a question for them, but why was this instruction on the table at all if everybody's agreeing that incorporation by reference? I think that is a fair question. It was an issue at summary judgment, to be totally clear. It was an issue at summary judgment. It just had gone away by the time of trial and the way the evidence came out at trial. I think there was some confusion between two different issues. Incorporation by reference, meaning is the 2014 TNCs incorporated at all versus is it only the 2014 TNCs? Our position at trial was it's not only the 2014 TNCs, and that's the argument we made for the jury, and that's the argument that the language they quote from the closing argument was going directly to that issue. The point was because it was not finalized, because it was not signed, because it was not attached as Exhibit A, they weren't just talking about the 2014 TNCs. What they were talking about is whatever terms and conditions relationship you're going to enter into that's going to control these HDMI products, that is the ODM contract we're referring to, whether it's the initial one, whether it's the 12 amendments, whether it's updated later, or whether what's functionally the equivalent, which is a 13th amendment, that they just called something else. Okay. Thank you very much, Ms. Sherry. May it please the court, I'd like to address four issues in three minutes. First, the core interpretation question, second, section 7.5, third, what the jury found, and then fourth, the instructional issue. On the interpretation question, the way that I understand Ms. Sherry's argument this morning, what she means by a clean break is really that the parties had to cease for two years and then, and only then, could enter into a new agreement. Now, leaving aside the fact that Alink's threshold argument would seem to suggest that even that agreement would constitute an ODM contract under the agreement, because they take the assumption that any agreement would so qualify, that does, I would respectfully submit, create something of a Hotel California situation, where Cypress would really be disempowered from entering into any sort of agreement with Crestron that did not involve Alink. And when you get right down to it, what Alink is attempting to do is to read a new limitation into section 7.1, to condition a valid termination on the absence of a violation of section 2.1. That cannot be correct. Section 2.4 itself, by its terms, does not have a dependency relationship with termination. Indeed, section 7.5 ensures that that obligation exists even after termination. And yet, it is Alink that is trying to mash those two things together. Now, second, with regard to section 7.5, I just want to make the point that with regard to this question of what the remedy would be for a breach of section 2.4, Alink's own damages expert read section 7.5 the same way that we are reading it. Alink's own damages expert suggested that the damages would be for a two-year period after the termination of the contract for a breach of section 2.4. With regard to what the jury found here, I want to point the court to page ER15, which is the jury's verdict form on the claim for breach of contract. As we point out in our reply brief, in contrary to Alink's representations, that instruction merely described Alink's claim and set out both of the theories of breach. It did not disaggregate them. And so again, I don't think that we can have any confidence that the jury would have found a breach of section 2.4 on which to award damages if that had been the sole issue in front of the jury. And finally, with regard to the instructional issue, I just want to clarify what actually took place here. It is true that in the colloquy on the jury instruction, after the district court said that this question of incorporation by reference was a matter for the jury, that Alink's own counsel, Mr. Leon, said, and this is actually, I believe, not page 1064, but page 1046, he said, I'm frankly not even sure that incorporation by reference has much to do with this case. Was this an instruction your client requested ultimately? Well, we proposed language because the court had said that this was a matter for the jury. And the district court gave a different instruction containing the language about the agreement having to exist. And I want to close by pointing out— Why did your client ask for the language in the first place? Well, I think that my client certainly had taken the position at summary judgment that this was not a matter for the jury. But once the district court had made that determination, it was trying to propose language that was legally correct and faithful to this court's decision in Poubon. But Judge Brass, I would point you and the court to page 1133 and the closing. And at this point in the closing, Allyn's counsel, Ms. Johnson, went to town on this issue. She pointed out the fact that the ODM agreement was not attached. She pointed out that the title was different. And then she said, and I'm quoting, other problem. It didn't exist. It was signed later between, you know, three weeks from the effective date, nine days from one of the signatures, six days from the other signature. It didn't exist in its mind. Is this part of a broader argument that what this, what ODM contract means is a sort of more floating concept that can refer to a broader relationship? Well, I think contrary to that, Judge Brass, I do think with respect, this was an effort to sow confusion. Remember, at the beginning of the case, that one of the arguments that Allyn made was that the ODM contract didn't exist and that they were entitled to prevail on that ground. Now I think Allyn wisely concedes that the lack of attachment and the arguments concerning incorporation by reference are of no moment. I would submit that that confusion alone would be grounds for reversal, but I think now that we're all in agreement that the original 2014 terms and conditions qualified, that just merely squarely tees up the discrete question of whether or not ODM contract means any contract, including contracts after these sophisticated parties engaged in the act of termination. I'm glad you go a little over your time. Let me see if my colleagues have any further questions. Mr. Chammergian, thank you. Ms. Sherry, thank you. This matter is submitted.
judges: THOMAS, BRESS, ALBA